1              **UNITED STATES DISTRICT COURT**
               **MIDDLE DISTRICT OF FLORIDA**
2                    **TAMPA DIVISION**

3    UNITED STATES OF AMERICA,

4                        Plaintiff,

5         vs.                    CASE NO. 8:21-cr-101-KKM-SPF
                                 June 23, 2022
6                                Tampa, Florida
                                 9:04 - 10:35 a.m.
7
     BRANDON WILLIAMS,
8
                          Defendant.
9    _____/

10

11              TRANSCRIPT OF SENTENCING HEARING
            BEFORE THE HONORABLE KATHRYN K. MIZELLE
12               UNITED STATES DISTRICT JUDGE

13
     **APPEARANCES:**
14
     For the Government:      RACHEL K. JONES, ESQ.
15                            Assistant U.S. Attorney
                              400 N. Tampa Street, Suite 3200
16                            Tampa, Florida 33602
                              813/274-6000
17
     For the Defendant:       RONALD J. MARZULLO, ESQ.
18                            Law Office of Ronald J. Marzullo
                              P.O. Box 1205
19                            Valrico, Florida 33595
                              813/662-3080
20
     Transcriptionist:        Howard W. Jones, RDR, RMR, FCRR
21                            801 N. Florida Avenue, Suite 15A
                              Tampa, Florida 33602
22                            813/301-5024

23

24

25   Proceedings reported and transcribed by
     computer-aided transcription.

```
 1                   P R O C E E D I N G S

 2              (Court called to order.)

 3              THE COURT:  Good morning.  We are here in

 4    Case 8:21-cr-101, United States vs. Brandon Williams.

 5              Who speaks for the United States?

 6              MS. JONES:  Good morning, Your Honor.  Rachel

 7    Jones on behalf of the United States.

 8              THE COURT:  Good morning, Ms. Jones.

 9              And who speaks for the defendant?

10              MR. MARZULLO:  Ronald Marzullo, Your Honor.  Good

11    morning.

12              THE COURT:  Food morning, Mr. Marzullo.

13              Good morning, Mr. Williams.

14              THE DEFENDANT:  Good morning, ma'am.

15              THE COURT:  Can you please stand and raise your

16    right hand?  I'm gonna ask the courtroom Deputy to please

17    swear you in before we begin.

18              (Defendant sworn by the Deputy Clerk.)

19              THE DEFENDANT:  Yes, ma'am.

20              THE DEPUTY CLERK:  Thank you.  You may be seated.

21              THE COURT:  Who is here from probation this

22    morning?

23              PROBATION OFFICER:  Deanna Lorenz with U.S.

24    Probation.

25              THE COURT:  Good morning, Ms. Lorenz.
```

1          Mr. Williams, on March 29th, 2022, you entered a

2    plea of guilty to Count One of the indictment that charged

3    you with conspiracy to commit mail fraud and wire fraud, in

4    violation of Title 18, United States Code, Sections 1341,

5    1343, and 1349.  The Court has previously accepted your

6    guilty plea and adjudged you guilty of that offense.

7          I'm sure your counsel has explained this to you,

8    but it's my job to first this morning properly calculate the

9    United States Sentencing Guidelines and resolve any

10   objections to those.  After I do that, I need to then

11   consider the sentencing factors that Congress has laid out

12   in Title 18, United States Code, Section 3553.  In doing so,

13   the goal is to fashion a sentence that's sufficient, but not

14   greater than necessary, to achieve those purposes of

15   punishment.

16         After I give counsel an opportunity to make

17   additional argument as to what the appropriate sentence is

18   under that statutory basis, I'll give you an opportunity to

19   say anything on your own behalf.  You are not under any

20   obligation to do so, but I like to tell defendants ahead of

21   time so they know that there's an opportunity coming.

22         Do you have any questions before we start?

23         THE DEFENDANT:  No, ma'am.

24         THE COURT:  Okay.  So the Court has ordered a

25   presentence investigation report, which has been provided to

```
 1   counsel.
 2           Mr. Williams, have you had an opportunity to read
 3   and review that presentence investigation report with your
 4   attorney?
 5           THE DEFENDANT:  Yes, ma'am.
 6           THE COURT:  Do you have any questions with regards
 7   to the presentence investigation report?
 8           THE DEFENDANT:  May I have a second to speak with
 9   my attorney?
10           THE COURT:  Yes.
11           (Brief pause in proceedings.)
12           MR. MARZULLO:  Thank you.
13           THE DEFENDANT:  No questions, ma'am.
14           THE COURT:  No questions.  Okay.  And are you
15   satisfied with Mr. Marzullo's representation in this matter?
16           THE DEFENDANT:  Yes, ma'am.
17           THE COURT:  Okay.  Mr. Marzullo, have you had an
18   opportunity to read and review the presentence investigation
19   report with your client?
20           MR. MARZULLO:  I have, Your Honor.
21           THE COURT:  Okay.  And it's my understanding there
22   are some outstanding objections?
23           MR. MARZULLO:  There are, Your Honor.
24           THE COURT:  Would you like to take them at this
25   time?
```

1           MR. MARZULLO:  Yes.  Thank you.

2           Your Honor, initially, I would like to let the

3   Court know that there were two people here on behalf of

4   Mr. Williams.  His fiancee, Kasi Royster, R-o-y-s-t-e-r, and

5   his father, Heath Williams, are present.  I believe that

6   when given an opportunity, Ms. Royster would like to address

7   the Court, possibly the defendant's father.

8           THE COURT:  Understood.  After Ms. Jones gives her

9   presentation, if you would like to call them first before

10  you make argument or vice versa.  When we get to the 3553(a)

11  Section, I welcome any comments they have.

12          MR. MARZULLO:  All right.  Thank you, Your Honor.

13  Your Honor, we would adopt the -- our response to the

14  presentence report and also our sentencing memorandum, so I

15  will be summarizing.

16          THE COURT:  Okay.

17          MR. MARZULLO:  Your Honor, as far as the -- our

18  initial objection, Objection No. 1, dealing with the time

19  involved in the conspiracy, we believe that has been

20  resolved, so that will be withdrawn.

21          Objection No. 2, Your Honor, at paragraph 46 of

22  the PSR, the use of prepaid debit cards, a two level

23  recommendation by probation for increase in the Guidelines,

24  we realize, Your Honor, that the plea agreement is not

25  binding on the Court, nor in -- or binding on the government

1    as far as the guideline calculation.  However, in the plea

2    agreement, there was an agreement as to the estimate of the

3    Guidelines and the increase for use of prepaid debit cards

4    was not included in that estimate.  We did not anticipate

5    that increase being recommended.

6            The -- factually, the leader of this conspiracy, a

7    Mr. Levinson, who is charged in another indictment,

8    Mr. Levinson obtained the cards, Mr. Levinson sent the

9    card's information to Mr. Williams and the other two named

10   individuals in this indictment.  And we would ask the Court

11   to not hold Mr. Williams responsible for that increase that

12   really was accountable to Mr. Levinson in the Vietnam

13   conspirators who have not been indicted as to the debit card

14   actions.

15           Mr. Williams did not know what Mr. Levinson was

16   doing aside from Mr. Williams' direct involvement with

17   Mr. Levinson and Mr. Williams had no knowledge at all with

18   the Vietnamese co-conspirators were doing and he didn't even

19   know that there were co-conspirators in Vietnam.

20           That is basically our presentation regarding

21   Objection No. 2, the use of the debit card, Your Honor.  May

22   I continue with my next objection?

23           THE COURT:  Let me ask a couple of follow-up

24   questions.  So Mr. Williams' co-defendants in this

25   indictment raised the same objection.  I overruled it at the

1    time, because I -- and I'm still of the mind that -- I

2    understand Mr. Levinson played the primary role in this

3    entire enterprise or at least is the most culpable, but it

4    does seem that under just a strict reading of the Guidelines

5    that the -- your client's participation with the prepaid

6    debit card does satisfy either the production or the

7    trafficking of the unauthorized access device.  I don't

8    think there's any dispute that they qualified as

9    unauthorized access devices; is that correct?

10             MR. MARZULLO:  Yes, ma'am.

11             THE COURT:  Okay.  As a result, I took that into

12   account.  I think that -- I think it technically applies.  I

13   understand it wasn't contemplated by the parties at the plea

14   agreement and I took it into account when I fashioned a

15   sentence and they both got downward variances, in part for

16   that basis.  But you may continue and I'll ask Ms. Jones to

17   respond.

18             Oh, I'm sorry, did you also have an adjustment for

19   role?

20             MR. MARZULLO:  I did, Your Honor.  I thought

21   that --

22             THE COURT:  I'm sorry, I was unclear.  Yes, you

23   may continue with the objections and then I'll let Ms. Jones

24   respond to all of them at the end.

25             MR. MARZULLO:  Okay.  Thank you, Your Honor.  Your

1  Honor, we're requesting a minor role for Mr. Williams and

2  asking him -- asking you to compare the intended loss

3  applied to Mr. Williams.  And in the addendum, the Probation

4  Office suggests that that is not a consideration as far as

5  comparing intended loss.  And I would ask the Court and I

6  would suggest to the Court that it is a consideration as far

7  as looking at Mr. Williams' participation and minor role.

8  Mr. Williams' participation, as far as intended loss, was

9  $2,192,734.

10         Mr. Levinson's intended loss was over, I believe

11  it was, 60 million or --

12         THE COURT:  60 million.

13         MR. MARZULLO:  60 million, yes.  Mr. Carr and

14  Mr. McNeely's intended loss was over $17 million.

15  Mr. Williams' intended loss was far less than even Mr. Carr

16  and Mr. McNeely's intended loss and it was -- the difference

17  between Mr. Williams' intended loss and Carr and McNeely's

18  intended loss was $15,467,084.  So that's a significant

19  difference in intended loss.

20         Also, Your Honor, as far as minor role,

21  Mr. Williams' time in this conspiracy was considerably less

22  than Mr. Levinson's by far and also as to Mr. Carr and

23  Mr. McNeely.  The conspiracy as charged was from at least

24  mid 2014 and got continued until at least the spring of

25  2018.  Mr. Williams' participation was from mid 2015 to

 1    early of 2017.  So he was not involved in the conspiracy --

 2    in the full extent of the time period of the conspiracy.

 3    And significantly less time.

 4              Now, in looking at the actual loss for

 5    Mr. Williams, it's shown as $347,148.

 6              THE COURT:  Yes.

 7              MR. MARZULLO:  And all but about between 10 and

 8    15 percent of that actual loss was sent to Mr. Levinson.  So

 9    Mr. Williams received a commission of between 10 and

10    15 percent for his activity in this conspiracy.

11              Also, Your Honor, Mr. Williams debriefed, he

12    proffered with the agents, and it was complete and truthful.

13    He named others involved in this conspiracy, including those

14    that have been named.  And he also and, importantly, told

15    the agents in the proffer of who recruited him.  He named

16    that individual.  The government fully knows who that

17    individual who recruited Mr. Williams was.  He was ID'd, but

18    thus far, not indicted although he recruited Mr. Williams.

19    And that recruiter was a direct participant in the overall

20    conspiracy.

21              So we would ask the Court to also compare

22    Mr. Williams' involvement with his -- the person who

23    recruited him.  And that recruiter is a higher level

24    participant in the hierarchy of this conspiracy.  I would

25    ask the Court to consider the Eleventh Circuit opinion in

1   *United States vs. Valencia*.  It's cited in our sentencing

2   memorandum.  And it clearly shows that Mr. -- that the

3   recruiter was upper echelon compared to Mr. Williams.  And

4   in the *Valencia* case, the Eleventh Circuit -- it's an

5   unpublished case -- the Eleventh Circuit says to the Court

6   at sentencing that it should consider the defendant's role

7   vis-a-vis the person who recruited the defendant as a -- a

8   recruiter being a higher up.  So we would ask the Court to

9   consider that Mr. Williams' role in the conspiracy vis-a-vis

10  this identified recruiter.

11          THE COURT:  Mr. Marzullo, it's my understanding,

12  though, that *De Varon*, the kind of governing case

13  interpreting this minor role, requires me to assess whether

14  the defendant is a minor or minimal participant in relation

15  to the relevant conduct that's attributed to him and here

16  he's not being attributed to the -- like, for example,

17  Mr. Levinson, the 60 million intended loss, he's being

18  attributed to the loss that he participated in.

19          So it correlates to his involvement in the

20  conspiracy, so it's not appropriate for me to compare him to

21  conspirators who would have been held to a higher relevant

22  conduct loss.  It needs to be -- it needs to be someone who

23  is being held to the same amount.

24          In terms of the relevant conduct, that's

25  attributed to him.  So I'm not sure why Mr. Levinson or an

1   unindicted recruiter are the appropriate comparators here.

2          MR. MARZULLO:  Well, Your Honor, I would ask the

3   Court to consider the overall conspiracy and compare that to

4   Mr. Williams' participation and that is --

5          THE COURT:  But I guess what I'm asking, is I

6   don't think *De Varon* let's me do that.

7          MR. MARZULLO:  I believe it does, Your Honor.

8   It's, as far as identifiable and discernible, other

9   individuals in the conspiracy that he would need to be

10  compared with as far as *De Varon* and also *Valencia*, which is

11  unpublished, more specifically -- in fact, specifically,

12  says to compare him to the recruiter if that recruiter is

13  identifiable and discernible, and it is here.

14         THE COURT:  Okay.  I think I understand your

15  argument.  Thank you.

16         MR. MARZULLO:  Okay.  That's what we have in the

17  way of our objections to the calculation of the Guidelines,

18  Your Honor.

19         THE COURT:  Okay.  Thank you.

20         MR. MARZULLO:  Thank you.

21         THE COURT:  Ms. Jones.

22         MS. JONES:  Good morning, Your Honor.

23         THE COURT:  Good morning.

24         MS. JONES:  I too will primarily rely on my

25  sentencing memo, which is at Document 122 to address these.

1          As to the access device fraud issue, Your Honor

2    noted that we had addressed this issue before.  As I stated

3    in my sentencing memorandum, that, you know, we made a

4    good-faith calculation as to the Guidelines calculation in

5    the plea agreement and, unfortunately, I was simply wrong

6    and I think Probation was right in the instance and I'm

7    required to proceed with what is the correct Guidelines

8    calculation.  And the PSR itself I think reflects

9    Mr. Williams' involvement, specifically with the prepaid

10   debit card, to support that enhancement.

11          As to the minor role, again, I primarily relied on

12   *De Varon* as well.  His loss is appropriately and accurately

13   and narrowly tailored to fit his conduct.  I think that

14   there are good legal arguments that his loss amount could be

15   higher, it could include -- I mean, the argument typically

16   is that it needs to be within the scope of the conspiracy of

17   what you are participant and reasonably foreseeable to you.

18   And so his loss amount could have conceivably included the

19   conduct by his recruiter.  But we didn't do that, we made it

20   very narrow and very tailored to his own personal conduct.

21   And for that reason, considering the conduct of his

22   recruiter, it's sort of inappropriate here.  It's just a

23   different set of facts than the case that he's relying on.

24          The other kind of important distinction I think is

25   that this isn't a case where Mr. Williams' communications

1    were sort of facilitated upward through a middleman.  He was

2    brought in -- you know, recruited into the conspiracy, but

3    he was communicating directly with Mr. Levinson.  As you can

4    see in the PSR, you know, he was not texting, because they

5    were using -- chatting card numbers and that sort of thing

6    directly with Mr. Levinson and getting it back.  And then

7    again, this loss is extremely narrowly tailored to his

8    particular conduct.  And so for that reason, I don't think

9    he can meet his burden as to minor role.

10            THE COURT:  Understood.  Okay.  Thank you.

11            I'll take the minor role one first, since that's

12   where we ended on talking.  So I'm gonna overrule the

13   objection.  I think the analysis under 3B1.2 for a minor

14   role participant requires me to consider whether he's

15   substantially less culpable than the average participant.

16   And under the Eleventh Circuit case law interpreting the

17   minor role reduction, I do look to see his -- whether he's

18   substantially less culpable than the average participant

19   includes looking to see the relevant conduct attributed to

20   the particular defendant.  And here I agree with the

21   government that it is narrowly tailored to what Mr. Williams

22   actually did, not even the full scope of what arguably is

23   reasonably foreseeable as being part of the conspiracy

24   itself.

25            Now, certainly Mr. Levinson, as I said, appears to

1   be more culpable and might be warranted an aggravating role,

2   but he's not before me and the question is just whether

3   Mr. Williams is substantially less culpable than the average

4   participant.  And the guidelines give me things to look at

5   to decide that, such as the degree that he understood the

6   scope and the structure of the criminal activity.  I think

7   his communications with Mr. Levinson certainly informed him

8   that the scope of the enterprise could have extended beyond

9   just the actual tax returns and money he was helping obtain.

10          And certainly his role in the entire offense, it

11  wouldn't have been effectual had he not been participating.

12  That's true of him and his two co-defendants who were

13  indicated in this particular charge.

14          With regards to the production and trafficking of

15  an unauthorized access device, for the reasons I overruled

16  that in the two co-defendants' cases, I'm overruling it

17  here.  I do think it was -- it's clearly the debit cards

18  that were -- prepaid debit cards that were sent qualify as

19  an unauthorized access device and whether -- on both it's on

20  the scope of the jointly undertaking activity of

21  Mr. Levinson and Mr. Williams and his co-conspirators here.

22  He also used and received the unauthorized access devices

23  derived from the fraudulent tax returns and then withdrew

24  the preloaded funds for his benefit and also for

25  Mr. Levinson benefit.  So I think Probation is correct that

1   that does apply here.  But I, of course, will take into

2   consideration that it wasn't contemplated by the parties.

3           Okay.  Are there any other objections, factual or

4   to the presentence investigation report's guideline

5   calculations?

6           MS. JONES:  Not from the United States, Your

7   Honor.

8           MR. MARZULLO:  Nothing further, Your Honor.

9           MS. JONES:  I do have a motion at some point,

10  but --

11          THE COURT:  Yes, I'm aware.

12          Okay.  Before we get to the Rule 5K, the

13  government is making the motion for the third point

14  reduction, timely acceptance at this time?

15          MS. JONES:  Yes, Your Honor.

16          THE COURT:  Okay.  The Court grants the motion and

17  notes that the recommended presentence investigation report

18  anticipated that Mr. Williams would get the full three

19  points of credit for timely acceptance.

20          I also see that the government has made a Rule 5K

21  motion for a one level variance -- or one level departure

22  based on defendant's substantial assistance?

23          MS. JONES:  Yes, Your Honor.

24          THE COURT:  Okay.  So that would make total

25  Offense Level 25?

1          MS. JONES:  Yes, Your Honor.

2          THE COURT:  The Court finds that the government's

3     motion is well taken.

4          Yes, sir?

5          MR. MARZULLO:  May I be heard, Your Honor, on the

6     5K?

7          THE COURT:  Yes.

8          MR. MARZULLO:  Thank you.  Your Honor, the defense

9     is requesting more than one level reduction based upon the

10    5K1 motion by the government.  We would request that the

11    Court reduce at least one more level and maybe up to four

12    levels based upon the 5K.

13         Mr. Williams did proffer and, as I mentioned

14    earlier, Your Honor, he gave the government truthful and

15    complete information and he also informed government as to

16    the recruiter.  That recruiter, Your Honor, was known to the

17    government even before Mr. Williams provided detailed

18    information as to the recruitment of Mr. Williams by the

19    recruiter.  That individual has not been indicted to my

20    knowledge and it is very likely that he will not be indicted

21    due to the time lapse of the conspiracy, which I would

22    suggest to the Court that there is still time to indict him,

23    although the government might dispute that, since this

24    conspiracy lasted until 2018.  So there was still time to

25    indict that recruiter who was a principal in this

1    conspiracy.

2              So we would request, based on that, Your Honor,

3    that the Court grant more levels as far as Mr. Williams'

4    cooperation with the government.  Thank you.

5              THE COURT:  Okay.  Thank you.

6              Ms. Jones, do you want to respond?

7              MS. JONES:  I think that we talked about this in

8    the last sentencing, but there are many people involved in

9    this conspiracy who are not indicted.  Practically speaking,

10   it's very difficult to indict the shear number of people,

11   but primarily our focus in this case was based on the people

12   with whom we had communication with Mr. Levinson, because

13   that allowed us to get into sort of like the details of

14   their involvement and their knowledge.

15             Mr. Williams is correct that we had previously

16   identified several other individuals with whom we just did

17   not have those same level of communications detailing their

18   involvement that allowed us to feel that we could charge

19   them.  Even with Mr. Williams' identification, I don't know

20   that that necessarily puts us over the ability to indict.

21             I do disagree with Mr. Marzullo, I don't -- I

22   think Mr. Marzullo's position is that because the conspiracy

23   continued even though that individual had sort of withdrawn

24   and moved on, we could still indict him.  I don't think that

25   that's true.  I think that the statute of limitations would

1   be based on that person's withdrawal of the conspiracy,

2   which means we're out of the statute.

3           This is very not typical for our office to move

4   for even one level.  We have very strict guidelines about

5   how many levels that we win and how many levels we can

6   request for certain conduct, and so it's typically two

7   levels for a charge or two levels for a plea and I kind of

8   had to go to my supervisor and really push her to allow me

9   to ask for this level, because he did come in, he was very

10  truthful, he tried.  And I understand that sometimes it can

11  be really difficult when you're sort of at the bottom to

12  have a lot of -- this is the nature of cooperation, right?

13  And the person at the top always has the most information,

14  the most culpable person does.  And so for that I wanted to

15  give him a level which is not typical for our office and not

16  common, but it does not meet our guidelines for any more

17  than that.  And so I would ask that we stay within that one

18  level.

19          THE COURT:  Was he in any -- any of the

20  information provided useful in (inaudible) Mr. Levinson, who

21  does seem to be the --

22          MS. JONES:  No, Your Honor.  By the time that

23  Mr. Williams had proffered, Mr. Levinson had already signed

24  his plea agreement.  He was still in the United Kingdom.

25  And in fact, Mr. Levinson proffered to us about

 1  Mr. Williams' involvement, because at the time Mr. Williams

 2  hasn't pled yet and he was sort of -- so it was in fact

 3  quite the opposite.  Now, typically in our office you don't

 4  get credit for cooperating downward, you really want it kind

 5  of upward or laterally.  That's another issue, but --

 6          THE COURT:  When is Mr. Levinson's sentencing

 7  before Judge Honeywell?

 8          MS. JONES:  I think it's in August.  He is -- he

 9  continues to cooperate.  We may ask for it to be moved

10  again, just because, frankly, once he's moved to a jail

11  that's further away would be very hard to work with him

12  consistently.  So we may ask her to move that again.  He's

13  detained and, you know, in town, so we just continue to work

14  with him.

15          THE COURT:  I'm sorry, one more question.  When

16  did Mr. Williams proffer after he was charged?

17          MS. JONES:  I believe it was spring of this year.

18  So Mr. Levinson -- he proffered before he pled, which was

19  sort of unusual, because I don't know if you recall, but we

20  were kind of butting up toward trial and Mr. Levinson was

21  sort of the -- I'm sorry, Mr. Williams was sort of the

22  holdout.  But he had already been proffering at that point

23  and so it was sort of unusual.  But I'm fairly certain the

24  first time we talked to him was in January and then we spoke

25  to him at least one more time via VTC both times.

```
 1              THE COURT:  Okay.  Thank you.
 2              Okay.  I'm going to grant the government's motion
 3    for a one level variance and overrule the objection for
 4    additional downward departures base primarily on the
 5    government's assessment of the significance and usefulness
 6    and, therefore, how I evaluate the significance and
 7    usefulness of the defendant's assistance.  I understand he
 8    did identify his recruiter.  It is contested whether that
 9    can lead to an indictment or not given the time remaining or
10    the time that's now expired under the statute of
11    limitations.  So I do take into consideration the
12    government's evaluation of the assistance that was actually
13    rendered in making that determination.
14              Are there any other objections to the factual
15    statements that support the offense level or criminal
16    history category?
17              MS. JONES:  Not from the United States.
18              MR. MARZULLO:  None, Your Honor.  Thank you.
19              THE COURT:  Okay.  And no objections otherwise to
20    the guideline calculations other than the ones we've already
21    addressed?
22              MS. JONES:  No, Your Honor.
23              MR. MARZULLO:  No, Your Honor.
24              THE COURT:  Okay.  There being no objections
25    otherwise -- there being no objections, I'm sorry, at all to
```

 1    the factual statements supporting the offense level or

 2    criminal history category, and no objections to the

 3    guideline calculations other than those that I've already

 4    overruled contained in the presentence investigation report,

 5    the Court adopts those statements as its findings of fact

 6    and determines that the advisory guidelines with the Rule 5K

 7    incorporated are as follows:

 8           So the new Offense Level is a 25, with a Criminal

 9    History Category of I.  That yields a sentencing guideline

10    range of 57 to 71 months imprisonment, one to three years

11    supervised release, $25,000 to $250,000 in a fine.  There is

12    mandatory $100 special assessment and restitution in the

13    amount of $347,000 -- $148 -- excuse me, $347,148 in

14    restitution to the IRS.

15           Are there any objections to how the Court has

16    articulated the Sentencing Guideline range?

17           MS. JONES:  Not from the United States, Your

18    Honor.

19           MR. MARZULLO:  Your Honor, if I may on

20    restitution.  As shown in our sentencing memorandum,

21    Mr. Williams was charged in a State of California-related

22    case.  In that case, he was -- he had to pay $27,000 in

23    restitution.

24           THE COURT:  To whom?

25           MR. MARZULLO:  I'm sorry, Your Honor?

```
 1              THE COURT:  To whom?

 2              MR. MARZULLO:  To the victims in that particular

 3   California case, Your Honor.

 4              THE COURT:  So not the IRS?

 5              MS. JONES:  It was the State of California.  It

 6   was a related scheme, but they were filing State of

 7   California tax returns, so they're not the same tax returns

 8   that are at issue here.

 9              THE COURT:  Okay.

10              MS. JONES:  It was like Mr. Levinson was involved,

11   they were kind of doing the same exact thing, but --

12              THE COURT:  But with state returns?

13              MS. JONES:  State returns.

14              THE COURT:  I see.  Okay.  Continue.

15              MR. MARZULLO:  Well, Your Honor we would just ask

16   the Court to consider that $27,000 which Mr. Williams paid

17   to -- paid in restitution during the term of his three-year

18   probation in the State of California case, so we would ask

19   the Court to consider that in reducing his restitution.  I

20   understand the government's position, Your Honor, that

21   different tax entities, government tax entities.

22              THE COURT:  I did have -- Mr. Marzullo, I saw the

23   mention of that, but I don't -- the presentence

24   investigation report doesn't tell me that much about the

25   state charge.  So these were state returns for other victims
```

1   in California?

2           MR. MARZULLO:  Yes, Your Honor, they were separate

3   from this particular case as far as who the victims were.

4           THE COURT:  Is it the same time period?

5           MR. MARZULLO:  Yes, Your Honor.

6           THE COURT:  Okay.  And he's fully paid his $27,000

7   in restitution?

8           MR. MARZULLO:  He did, Your Honor, during his

9   three years of probation in the State of California-related

10  case.

11          THE COURT:  Was that the total tax loss to the

12  State of California?

13          MR. MARZULLO:  I'm not -- I don't have all the

14  information regarding the State of California case.  It was

15  represented by retained counsel there, but -- so I don't

16  know, Your Honor, all the details.

17          THE COURT:  Okay.  Thank you.

18          With regards to how the Court has articulated the

19  Sentencing Guideline range in this case, is there any

20  objection to how I articulated them?

21          MS. JONES:  Not from the United States, Your

22  Honor.

23          MR. MARZULLO:  No, Your Honor.  Thank you.

24          THE COURT:  Okay.  Now, as I've mentioned at the

25  beginning of this sentence hearing, I have read the

1   sentencing memos provided by both counsel and at this time I

2   would welcome any additional argument from the government as

3   to the appropriate sentence.

4           MS. JONES:  Your Honor, as with Mr. McNeely and

5   Mr. Carr, in this case I am requesting a sentence at the low

6   end of the guideline range.  Despite this weekend's sort of

7   activities, I think it's still an appropriate sentence in

8   this case.

9           I hate when you're kind of at the third sentencing

10  for a defendant, because I don't want to repeat everything

11  that I've told you before and I know you remember it well,

12  so I'll try to be sort of summary.  But, you know, there's

13  absolutely no doubt from my perspective or anybody's

14  perspective that Mr. Williams is not the penultimate

15  defendant in this case.  This wasn't a case necessarily for

16  Mr. Williams, who was recruited by another, but I mean,

17  Mr. Levinson basically placed Craigslist ads to make income,

18  right?  And this is what --

19          THE COURT:  He did what?  I'm sorry, placed

20  Craigslist --

21          MS. JONES:  Craigslist ads to recruit some people.

22  Not Mr. Williams.  But, you know, this is -- he's the one

23  that develops this scheme and kind of put everyone in place

24  and there's absolutely no doubt to that.  There is always

25  sort of a debate, in my opinion, you know, try to go after

1    the highest person that you can, but in all of these kinds

2    of scams that involve international defendants, surf

3    schemes, you know, call center scams, BEC, romance scams,

4    all of those scams need people in the United States who are

5    willing to participate in something that's, in Mr. Williams'

6    case, obviously illegal, and in other case at least of

7    murkiness in terms of what they know for a small amount of

8    money.  And if those money mules don't participate, then the

9    scam doesn't work.

10        Mr. Williams -- I'm sorry, Mr. Levinson cannot

11   file U.S. tax returns from his home in Nigeria or when he

12   was residing in Dubai and ask them to deposit, you know, my

13   refund into his Nigerian bank account.  It's simply not

14   going to work.  He has to have people here.  And I think

15   that there is an important deterrence, general deterrence,

16   of the public to know that -- that these sort of money mule

17   behaviors, while in this scheme sort of a lesser role, won't

18   be tolerated.

19        It's an important initiative for the United

20   States.  One of the things that we have kind of consistently

21   done over the past several years is when you come across

22   somebody who is muling money in a variety of ways, we

23   provide them with a letter and it details exactly what

24   they're doing, why it's, you know, typically laundering and

25   why they need to stop.  We do that for people where their

1    knowledge of the scheme isn't clear, right?  Sometimes

2    people fall into these schemes.  Some people start as a

3    romance scam, they spend their own money and then suddenly

4    they're laundering money, right?  We see that a lot.

5            In Mr. Williams' case, his chats again clearly

6    showed that he knew exactly what he was participating in.

7    His motives to need money are, frankly, honorable, as they

8    so often are.  You know, it is sort of rare to come across

9    somebody who commits crime out of pure greed.  Most people

10   have part of that that's a sense of need.  But it is,

11   nevertheless, an extremely important role and we don't stop

12   these schemes unless we stop money mules and that's why it

13   was important for us to charge people like Mr. Williams.

14           His loss -- or his Guidelines are accurately

15   calculated.  As I indicated to this Court, it's extremely

16   narrowly and favorably calculated and tailored to

17   Mr. Williams' conduct.  I think that it is important to hold

18   him accountable and a sentence of imprisonment is the way to

19   do that, especially in a scheme this big.

20           You know, of relative -- when you look at

21   Mr. Levinson's scheme, his role seems really small, but

22   we're still talking about a tax scheme of an intended loss

23   of over $2 million.  It's a very significant case.  It's

24   kind of funny that because of the significant of the overall

25   case, it seems like sort of a drop in the bucket, but it's

1  not.

2         So I would ask that the Court sentence him within

3  his applicable Guidelines range.  If the Court chooses to

4  vary or depart downward of equivalent levels to what you did

5  with Mr. McNeely and Mr. Carr, we wouldn't object to that,

6  because I have an understanding, one, this is what we

7  anticipated and, two, I think the factors sort of apply

8  equally.  But otherwise, I would request that the Court stay

9  within his Guidelines range.

10         THE COURT:  Can you give me any other sense -- I

11  realize the tax loss was different, the intended tax loss

12  was different, and Mr. Carr and Mr. McNeely worked together

13  whereas Mr. Williams didn't work with them.  But any other

14  way of evaluating the relative culpability so that I'm

15  making -- giving due account to disparities?

16         MS. JONES:  I think that the biggest driver for

17  the difference in their loss amount is time.  Mr. Williams

18  was just involved for a shorter amount of time.  I do not

19  know why he left -- well, actually, I think I do know why he

20  left the conspiracy.  So -- actually, can I have one moment

21  before I misspeak, I need to check something?

22         THE COURT:  Yes.

23         (Brief pause in proceedings.)

24         MS. JONES:  So that California State Tax Authority

25  did a search warrant of Mr. Williams' house.  We -- that was

 1   their investigation, we sort of walled ourselves off from

 2   it, so we don't know a lot about it.  But that's basically

 3   what stopped Mr. Williams' involvement.  Now, you know,

 4   would he have stopped otherwise?  I don't know.  It doesn't

 5   matter to me, I'm glad that he did stop, it's important and

 6   that did tailor his loss.  But that's really, you know, what

 7   he's -- he's got this nice tight involvement, because he

 8   stopped once the California State Tax -- which I commend him

 9   for, because, frankly, Your Honor, there are plenty of

10   people that search warrants are conducted at their houses

11   and it has zero effect on their behavior whatsoever.  And so

12   I do commend Mr. Williams for getting out at that point.

13          THE COURT:  How do I evaluate last weekend's

14   incident?

15          MS. JONES:  Your Honor, I think that for me, my

16   plan is to ask for him to be remanded today.  But I am not

17   asking for any additional sentence based on that.  I think

18   that it was, at least based on my conversation -- you know,

19   so you kind of -- first I'm thinking about how I felt on

20   Saturday.  So on Saturday, I thought that he was fleeing to

21   Mexico, which is not -- has happened with people who have

22   pled.  And what I would like for Mr. Williams to understand

23   and, as I spoke to Mr. Marzullo earlier, is that his actions

24   meant that Mr. Linbarger (ph), his supervisor, Ms. Andrews,

25   a pretrial services officer in California, Judge Wilson, and

1    Judge Flynn and I ended up spending a substantial part of

2    our -- and U.S. Marshals, substantial part of our

3    Saturday -- it took me about three hours to get the

4    warrants, to drive up to Mr. Wilson's house, Judge Wilson's

5    house to get these signed to get them submitted to ensure

6    that he was gonna appear before this Court.

7          And I understand that, you know, now I'm on the

8    other side of it, he returned.  I commend him for that.  He

9    apparently did not get off the boat in Mexico.  I commend

10   him for that.  But it was an extraordinarily careless sort

11   of disregard for this whole process I think, that -- and I

12   just -- there has to be some sort of awareness of the

13   consequences of being that careless when you have something

14   this big going on.  That's what I would say.

15         THE COURT:  Understood.  I'll obviously ask

16   Mr. Marzullo to address that.  I spoke with Judge Wilson

17   about it as well.  So I'm apprized it definitely was a

18   distraction for the court system and I am not sure I

19   understand it, so -- okay.

20         Did Mr. Carr and Mr. McNeely do a truthful

21   debriefing or proffer?

22         MS. JONES:  They did not debrief at all.  I think

23   that -- do you mind if we do this at sidebar, just because I

24   don't know if they would this to be discussed publicly.

25         THE COURT:  Yes.  That's fine.

1          (Sidebar.)

2          MS. JONES:  I think -- this may have been said in

3     open court at the other one, I just don't want to

4     (inaudible) somebody else's client.  For both Mr. McNeely

5     and Mr. Carr, my understanding is the people that they

6     recruited and were involved with were primarily family

7     members.  And this happens a lot and they just -- they

8     weren't willing to debrief against family.

9          THE COURT:  Understood.

10         MS. JONES:  They didn't debrief.  I don't think

11    they took full acceptance.

12         THE COURT:  I didn't get a Rule 5K or anything I

13    was just curious if they had given truthful proffer.

14         MS. JONES:  That's fine.

15         THE COURT:  Thank you.

16         (Sidebar concluded.)

17         THE COURT:  Okay.  Thank you, Ms. Jones.  I don't

18    think I have any further questions at this time for the

19    government.

20         Mr. Marzullo?

21         MR. MARZULLO:  Thank you, Your Honor.  Your Honor,

22    we are requesting a variance in a downward -- or and/or

23    downward departure for Mr. Williams.  Your Honor, I'm going

24    to repeat, but hopefully not in detail, what I've already

25    mentioned to the Court, but I do want to go ahead and touch

1    those bases.

2         We would ask the Court to consider a variance

3    based upon the actual loss and, as mentioned earlier, Your

4    Honor, Mr. Williams only received a small percentage of the

5    money in the actual loss that was sent to Mr. Levinson.

6         Also, Mr. Williams has already been prosecuted in

7    a related case, California State case.  He was sentenced to

8    three years of probation, which he completed successfully,

9    and he paid restitution in that case of $27,000.

10        The United States government, whenever that case

11   in California was brought in 2017, the United States

12   government was aware at that time, maybe not of all the

13   facts in this conspiracy, but a substantial amount of

14   information was available to the government.  And that case,

15   again, was in 2017.  Four years later he -- Mr. Williams

16   gets charged in this case and forced to run the gauntlet

17   again in a prosecution for actions that were related to the

18   2017 State of California case.

19        THE COURT:  Just to be clear, though, they're

20   not -- this isn't like a -- they are separate tax losses,

21   separate fraudulent tax returns that were secured, right?

22        MR. MARZULLO:  The facts were distinguished by the

23   state authority in California and the federal government in

24   this case, Your Honor.  So, you know, obviously it's not

25   double jeopardy.

1          THE COURT:  Well, wouldn't it be double jeopardy

2    even if it was the same exact -- all I'm saying is he's

3    already been -- this isn't like a -- it's not that the State

4    of California charged him for the same federal fraudulent

5    tax returns, they charged him for the state fraudulent tax

6    returns; is that right?

7          MR. MARZULLO:  Well, Your Honor, the government

8    authorities divided this case up.  And Your Honor is right,

9    it was -- the California case dealt with fraud as far as

10   California State was concerned.

11         THE COURT:  Okay.  I just wanted to make sure I

12   understand, because there's -- I think it's a different

13   mitigation argument if it's two different sovereigns

14   prosecuting you for the same underlying conduct and it

15   sounds like it's similar conduct, but different.

16         MR. MARZULLO:  Well, it involved the same -- many

17   of the same people, Your Honor.  It involved Mr. Levinson.

18         THE COURT:  No, but I mean, the actual fraud was

19   against a different sovereign, in that the monies deprived

20   of the State of California are not the same monies that were

21   deprived of the Internal Revenue Service; is that correct?

22         MR. MARZULLO:  That is correct, Your Honor.  But

23   our point is more general.

24         THE COURT:  Okay.

25         MR. MARZULLO:  Our point is that the federal

1    government knew in 2017 whenever the California case was

2    brought, knew maybe not every fact involved in this case,

3    but now much about this case whenever that case was brought

4    and then waited four years, about four years, to charge him

5    here.

6         So again, Your Honor, it's our argument that the

7    federal government in 2017 had the information and could

8    have charged him in a federal indictment at that time based

9    upon what the federal government knew at that time, in 2017,

10   which dovetailed the California State charges.

11        THE COURT:  I understand.  I think that probably

12   enures to your client's benefit, in that you can now point

13   to things like successful completion of his state

14   probationary sentence, gainful employment in the interim,

15   things like that, that if he had been indicted in 2018

16   wouldn't be able to be shown at that point.  But continue.

17        MR. MARZULLO:  Thank you, Your Honor.  Your Honor,

18   Mr. Williams will address the Court, but also we would ask

19   the Court whenever he is addressing the Court to consider,

20   and it's set forth also in summary fashion in our sentencing

21   memorandum, his reasons for getting involved in this case.

22   His infant son had a serious heart defect that was

23   diagnosed.  It was life threatening.  Mr. Williams' best

24   friend at that time knew Mr. Williams' situation as far as

25   his son and that Mr. -- and that best friend knew that

1    Mr. Williams did not have medical insurance, neither did the

2    mother of Mr. Williams' infant son.  So that was the person,

3    the best friend was the person who recruited Mr. Williams

4    into this conspiracy.  And Mr. Williams was faced with

5    basically a life or death situation for his infant son.  And

6    unfortunately, his better judgment was overrun by his

7    concern for his son's life.  And that's how he became

8    involved.  And Mr. Williams will address the Court.  And it

9    was well over -- the medical costs were well over a hundred

10   thousand dollars and maybe into several hundred thousand

11   dollar range to provide medical care and surgery for his

12   infant son.

13           We've already talked about the government's motion

14   for substantial assistance.  We've already talked about the

15   restitution that was already paid to the State of

16   California.  We would also ask the Court to look at actual

17   loss as compared to the intended loss.

18           Your Honor, just to kind of jump ahead, we are

19   requesting probation for Mr. Williams.  I understand that

20   the Guidelines do not calculate as a probation total offense

21   level.

22           Your Honor, there is also a request, and I don't

23   know if Your Honor wants to hear it now, to strike certain

24   paragraphs in the presentence report.  They are at paragraph

25   62 and 63.  May I at this time, Your Honor, or later?

1    THE COURT:  You can, if you want to address those

2    now.  I saw that request in the memo.

3    MR. MARZULLO:  Okay.  Your Honor, the probation

4    report only provides the docket information as far as those

5    two cases.  Our big concern here is that whenever -- if the

6    Court is going to sentence Mr. Williams to term of

7    imprisonment that the -- whenever the BOP sees that, those

8    two paragraphs in the PSR, very likely they will exclude

9    Mr. Williams from a camp or a very low level prison and

10   because of those two unsupported paragraphs in the PSR.

11   And, therefore, he would be facing a higher level of

12   security.  So that's why we would ask the Court to strike

13   those two paragraphs.

14   We will have a request at a later time, Your

15   Honor, and Ms. Royster, Mr. Williams' fiancee, would like to

16   address the Court also whenever it's appropriate, Your

17   Honor.  Thank you.

18   THE COURT:  Mr. Marzullo, sorry, there are a few

19   things I want you to address.  How am I to evaluate

20   disparity between Mr. Carr and Mr. McNeely?  And I

21   understand that the Guidelines have already taken into

22   account their relative intended loss.  And I did give them

23   downward variances, but a request for probation would be

24   really out of step with how I sentenced his two

25   co-defendant.  I mean, wildly so.  So if you could address

1    that for the Court, that would be helpful.

2         MR. MARZULLO:  Well, Your Honor, I would ask the

3    Court to look again to the arguments that we've presented as

4    to a minor role, the length of time in the conspiracy.

5    Mr. Carr and Mr. McNeely far much more time in the

6    conspiracy.  The roughly 15 million-dollar difference in

7    intended loss between compared to Mr. Williams with Mr. Carr

8    and Mr. McNeely.  Mr. Carr and Mr. McNeely were involved in

9    this conspiracy moneywise and timewise much more than

10   Mr. Williams.  So I would suggest to the Court that that

11   shows a substantial difference and as far as Mr. Williams'

12   disparate participation in this conspiracy.  So I would ask

13   the Court to consider that for a variance, Your Honor.

14        THE COURT:  Did you want to talk about his gainful

15   employment since the conclusion of his participation in the

16   conspiracy?  I thought that was probably your strongest

17   mitigating factor.

18        MR. MARZULLO:  Yes, Your Honor.  And Mr. Williams

19   can address that also, that he's been clean and a

20   substantial member of the community, teaching and coaching

21   in a religious school in the Los Angeles area, attending to

22   many underprivileged students and youth, and he's been

23   gainfully employed the entire time, continues to be

24   gainfully employed even though the school knows about this

25   case and they didn't terminate his employment, because

1    he's -- he's very good with children and teaching.  He's got

2    a good education, he comes from a good family.  Ms. Royster

3    has known him since the second grade and continues to

4    support him, as does his family.  We will address the

5    violation also.  I don't know when Your Honor wants us to

6    address that.

7            THE COURT:  Now would be a good time.

8            MR. MARZULLO:  Okay.  Your Honor, I'm just going

9    to give a lead-in to -- for Ms. Royster and also

10   Mr. Williams, but, Your Honor --

11           THE COURT:  How did he get on the cruise without a

12   passport?

13           MR. MARZULLO:  It's not needed, Your Honor, all

14   that's needed is a government ID.

15           THE COURT:  Okay.  Even though it's going

16   international?

17           MR. MARZULLO:  Even though it's going

18   international.  It's basically like, you know, the short

19   cruises that leave from, you know, Florida and go to the

20   Bahamas type of thing.  Mr. Williams did not get off that

21   vessel.  Mr. Williams -- and it was basically, you know, a

22   four-day period, but it wasn't four full days.

23           THE COURT:  Why did he go?

24           MR. MARZULLO:  Well, Your Honor, he and

25   Ms. Royster will address it further, but just to briefly.

1    Your Honor, the family, Ms. Royster, his fiancee, were well

2    aware that Mr. Williams is potentially facing a prison term

3    in this case.  It was for Father's Day, they decided to

4    surprise him with a trip.  They were not aware that it would

5    be in violation of any conditions of release.  Mr. -- now,

6    this is what's been relayed to me, Your Honor.  Mr. Williams

7    was at work.  He lives with his fiancee.  His fiancee packed

8    a suitcase without telling Mr. Williams.  Ms. Royster picked

9    Mr. Williams up at work.  Basically said, you know, we have

10   a surprise for you.  And Mr. Williams did not know what that

11   surprise was.  I believe that what was told to Mr. Williams

12   was, you know, we're going to go on a trip.  Didn't say

13   where they were going.

14        Mr. Williams was -- they picked up Mr. Williams'

15   son, it was a family trip, and took him to the -- and

16   Mr. Williams fell asleep in the car.  The next thing he

17   knows, they are in a parking lot at a cruise terminal.

18   Mr. Williams had never been on a cruise before and he's told

19   that they're going to Baja, California.  Mr. Williams was

20   not fully aware of where they were going other than saying

21   California, Baja, California.  He gets on the vessel and as

22   stated in the violation report, there's some communications.

23   Mr. Williams -- the vessel starts to leave the pier.  It's

24   in the water, not connected to the pier.  Mr. Williams asks

25   to leave the vessel.  He is told that he cannot leave the

1  vessel, they are underway.  The vessel goes to Baja,

2  California, fairly close to the United States border.

3  Mr. Williams does not get off that vessel.  And Mr. Williams

4  returns to Los Angeles, I guess it was Long Beach where the

5  boat came in.

6         And I had contact -- I was contacted by probation,

7  I had no idea that he went on this cruise.  Or planned to go

8  on a cruise or there was a family plan to go on a cruise.

9  And so I sent an email to him asking what's this about

10  Mexico?  He responded to me, you know, and of course, you

11  know, Judge, he has been compliant a hundred percent with

12  the terms of his release in this case.  Compliant a hundred

13  percent in three years probation in California.  This was,

14  in my understanding, a misunderstanding on his part as to

15  this trip, a surprise at the last minute, and obviously,

16  it's a technical violation of -- it's in violation of his --

17  of his release clearly.  And he knows that now.  And he

18  realized that once that boat started to leave, because he

19  spoke with the Pretrial Services officer.  And he tried to

20  get off that boat.  He was not allowed.

21         So, you know, again, Ms. Royster and Mr. Williams

22  can explain in more detail, but that's basically my

23  understanding of what took place.  And, Your Honor, he -- I

24  don't -- I know that Mr. Carr and Mr. McNeely were allowed

25  to self-report to prison, to turn themselves in.  And that's

1   what we are requesting here.  And up until this Father's Day

2   gift, surprise gift, I had been very hopeful that he would

3   be allowed to self-report.  And he wants to self-report.

4   And other than this unfortunate surprise incident, I think

5   that his chances of self-reporting are very, very good.

6          This has thrown a monkey wrench into that

7   unfortunately.  And I understand the government's position

8   and I understand Probation's position.  And I would

9   understand the Court's position if the Court determines that

10  based on this one incident just days before this hearing,

11  that the Court would not allow him to self-report.  But we

12  ask the Court to weigh what happened and understand what

13  happened, Your Honor.  Thank you.

14          THE COURT:  Thank you, Mr. Marzullo.  Would you

15  like to call any witnesses to testify -- to say anything in

16  behalf of Mr. Williams or Mr. Williams speak first?

17          MR. MARZULLO:  Well, I would ask Ms. Royster,

18  R-o-y-s-t-e-r, to come forward.

19          THE COURT:  Ms. Royster, if you could come to the

20  lectern and before you begin, state and spell your name so

21  the Court Reporter can make sure he has it.

22          THE WITNESS:  My name is Kasi Royster.  I'm an

23  English teacher at an independent study school in Riverside,

24  California.  I have been teaching for eight years now.  I

25  recently graduated with my second master's degree in

1   English.  First is in education.  I have known Brandon since

2   grade school, a catholic school where my mother is the

3   principal.  Brandon and I kept in contact after grade school

4   via social media, through the years on Facebook.  I watch as

5   Brandon played professional baseball, then became a coach,

6   then became a father.

7        About two years ago, Brandon asked me out on a

8   date and I said no.  He was very persistent.  Then last

9   April he asked me out on a date again.  This time I said

10  yes.  And this past February, Brandon proposed and our

11  wedding date is set for May 12th, 2023.  Brandon is a

12  baseball coach and owner of GGI, Go Get It Baseball Club.

13  It's made up of boys, ages 11 through 15.  And it's a good

14  team, went to grow each year.  Brandon has created more than

15  a team, he has created a family with the team.

16       Outside of practicing games, the families get

17  together often.  Myself included.  We recently went to a

18  Dodger's game as a team.  Brandon has exhibited

19  extraordinary leadership and management qualities through

20  GGI.  On Father's Day even he received several texts from

21  the players saying that he's a father figure for them.

22       As a father, Brandon loves with passion and with

23  compassion.  He's extremely supportive and he guides his son

24  and players to become the best men they can be.  Brandon has

25  shown me nothing short of being a supportive, loving, and

1   hardworking man who strives to walk in God's light every day

2   of his life.

3            And as for the trip, that was my surprise for

4   Father -- the first Father's Day together.  I didn't know it

5   was any sort of violation, so I really hope that does not

6   disrupt anything that was planned, because that was my

7   surprise trip.  Thank you.

8            THE COURT:  Thank you, ma'am.

9            MR. MARZULLO:  Your Honor, Mr. Williams would like

10  to address the Court.

11           THE DEFENDANT:  Good morning.

12           THE COURT:  Good morning.

13           THE DEFENDANT:  Growing up, I had a pretty

14  exceptional childhood.  My days were spent on a baseball

15  field or on a basketball court or just being with family and

16  friends.  I'm extremely nervous right now.  I'm from a big

17  family who truly shows me what it means that blood runs

18  deep.  My parents each got married again, so I grew up with

19  not just two, but four loving parents.  My time was spent

20  between my mother and my stepfather's home during the week

21  and my dad and stepmother's home during the weekends.  There

22  was never a time where I didn't feel valued, loved, or

23  supported in my family.

24           In high school my passion for baseball grew.  I

25  became very determined to be a professional baseball player.

1  After high school I went on to West Los Angeles Community

2  College, then continued to (inaudible) University, where I

3  received a degree in criminal justice and psychology.  I

4  continued on my path of playing baseball.  Afterwards I was

5  signed to the New York Mets.  During this time my dreams of

6  becoming a professional baseball player were only growing

7  stronger.  However, during this time my life changed

8  unimaginably.  I became a father.  My son was born -- Chase

9  Williams was born with congestive heart failure.

10         THE COURT:  You can take a moment.

11         THE DEFENDANT:  The actual name for it was

12  Tetralogy of Fallot, which means three holes in the heart.

13         My life finally had more meaning and purpose than

14  I could ever imagine.  My days become devoted to being a

15  father.  My goal was to create a great life for my son.  My

16  purpose was to make sure that I provided for my son with the

17  best life he could ever have.  Unfortunately, my son was

18  born with that heart condition and I was in shambles.  I had

19  to find a way to make sure that my son was okay.  This is

20  where an opportunity arose that was presented to me and lead

21  me into these unfortunate circumstances that I find myself

22  in today.

23         My best friend came to me with an opportunity to

24  make quick money.  Of course, I knew this wasn't the right

25  way to make money, but I also knew that it would provide me

1    with something to make sure that my son would not die.  I

2    cannot let that happen.  Out of an act of desperation to

3    help my son, I went down the wrong path and made a bad

4    decision.  One of the worst decisions of my life.  As I

5    said, growing up my family would bend over backwards to make

6    sure I was supported.

7            While this is a decision I have to live with for

8    the rest of my life, it's something that I did to make sure

9    my family was healthy.  My hope is that you understand the

10   reasons behind my actions.  My hope is that you see that

11   this wasn't an evil act of vengeance, rather than act of

12   desperation to take care of my family.  I know there are

13   consequences to my actions, however I pray that you see that

14   I am not a bad person, just a man who made a bad decision.

15   Thank you.

16            THE COURT:  Thank you, sir.

17            MR. MARZULLO:  May I have one moment?

18            THE DEFENDANT:  As far as the trip, on Friday

19   morning I train kids.  I coach baseball.  So my fiancee

20   picked me up.  We then went to go pick up my son.  I had no

21   idea we was going.  Bags were in the trunk.  We picked up

22   her mother.  While they talk and I fell asleep.  I woke up,

23   we were at a port at Long Beach.  I asked her where we

24   going?  She say, surprise.  I said, where we going.  They

25   say Baja, California.  I've never been a cruise, so I didn't

1   know -- Baja, California, it looks 67 miles away from my

2   house in the waters.  So I didn't think anything of it.

3   While on the boat, the boat's about to take off, Lorinda

4   (ph), my stepmother, calls my dad, and my dad is like, we

5   got to get off this boat, we got to get off this boat.  I

6   said, what's going on?  Officer Rosa (ph) then calls my

7   phone.  I ask her, I talk to her, I said, hey, what's going

8   on, Ms. Rosa?  My dad's in a panic, what's going on?  You

9   have to get off this boat, you have to get off this boat.  I

10  said, okay.  I hung up with her, I'm trying to get off the

11  boat.  I am desperately trying to get off this boat.  The

12  officers there said the boat has already departed from the

13  shore, you cannot get off this boat, we cannot stop this

14  boat.  It's not a plane, it's not a car, it's set.

15          So I called Ms. Rosa again, she did not answer the

16  phone, she just told me to have my phone on me at all times.

17  Service was really bad, but I did make contact with her at

18  least one time.  I did not get off the boat.  I stayed on

19  the boat.

20          I had no intention of on missing this day.  Our

21  flights cost us almost $2,000 to get here, just to fly.  If

22  given the opportunity to self-report, I pray that you grant

23  me that, because I apologize to anyone who -- that thought

24  that I was doing something wrong.  I had no idea, ma'am, and

25  I just want you guys to know that.  Thank you.

1          THE COURT:  Thank you, Mr. Williams.

2          For the record, I'm not gonna take any action on

3    the pending petition.  I'll just no action it and it will

4    moot itself out with regards to Pretrial.

5          Is there any reason why this Court should not now

6    proceed with the imposition of sentence?

7          MS. JONES:  No, Your Honor.

8          MR. MARZULLO:  No, Your Honor.

9          THE COURT:  Mr. Williams, it's my obligation to

10   fashion a sentence that's sufficient, but not greater than

11   necessary, to comply with the purposes that Congress has

12   articulated.  They did so in Section 3553(a).  Those factors

13   include the nature and circumstances of the offense, your

14   history and characteristics, the need for the sentence to

15   reflect the seriousness of the offense, and promote respect

16   for the law and just punishment.

17         The need for adequate deterrence includes specific

18   deterrence to yourself and to the public generally, which is

19   an important factor in white collar offenses.

20         The need to protect the public.  The need to

21   provide any educational or vocational training to yourself,

22   the kinds of sentences that are available, if there's any

23   pertinent Sentencing Commission policy guidelines or

24   statements.  Importantly here, the need to avoid sentencing

25   disparities, and then also here the need to provide for

1    restitution.

2            I have sentenced two of your co-defendants in this

3    case already.  I recognize, and their sentencing guideline

4    ranges captured this, that they were more culpable than

5    yourself, the amount of loss that they stole or attempted to

6    steal was far more significant than yours and that you

7    didn't work with them, that they worked separately.

8            With regards to the nature and circumstances of

9    the offense, you're being held accountable for your part in

10   a much larger scale.  And I said throughout the sentence

11   taking Mr. Levinson is clearly the most culpable and I hope

12   he receives a just sentence that reflects that higher level

13   of culpability.

14           The part of the nature and circumstances of your

15   offense that are distinguishable I think from him and from

16   your co-defendants is the motivation for why you

17   participated here.  It seems clear to me that you did so out

18   of desperation due to your child's need and a desire to pay

19   for his healthcare bills.  So I take that into consideration

20   as to the nature and the circumstances of what is a serious

21   offense and I do think needs to have a sentence that

22   reflects the seriousness and promotes respect for the law.

23           And, like I said, in white collar offenses

24   deterrence is just an important role for the public to

25   understand that even though it's the IRS that's owed the

1  restitution here, it's really the American people who have

2  suffered the financial loss that you caused.

3          And as Ms. Jones said, Mr. Levinson, who

4  orchestrated this scheme, would not have been able to

5  effectuate it had he not had, for lack of a better word,

6  money mules to make sure that he actually could get the

7  proceeds of his fraud and I have to hold you responsible for

8  your participation in that.

9          In terms of your history and characteristics, I

10  also think you are notable in what you've done since that

11  time.  That includes the truthful debriefing and proffer

12  with the United States, that's to your credit.  That

13  includes your gainful employment as a PE teacher and then

14  also as baseball coach.  For you in particular, and I read

15  the letters that were provided by your counsel and your

16  involvement with the young men in the baseball program is

17  commendable.

18          I also -- it cuts both ways in some regards, but I

19  think it actually ultimately enures to your benefit, the

20  successful completion of the state probationary term for the

21  related state tax offenses.  And in particular, your

22  counsel's representation that you paid the full $27,000 in

23  restitution.  I don't frequently see people doing that, so

24  that also is to your mitigation and commendable.

25          The weekend incident, I understand you didn't plan

1   it, or I understand that now.  I think Ms. Jones captured it

2   well in that it was reckless, it did cause quite an

3   unnecessary panic I think from the government and a need to

4   get an arrest warrant over a holiday weekend and it just

5   didn't show a carefulness.  I'm not going to increase the

6   sentence as a basis of that, but I am going to remand you.

7           Okay.  So at this time I am -- oh, one thing I

8   wanted to say, too.  As I mentioned earlier in the hearing,

9   I understand that the parties didn't contemplate the two

10  level increase for the production and -- or trafficking of

11  an access device fraud and I'm taking that into account,

12  because I realize that wasn't what the parties contemplated

13  when they entered their plea agreement.

14          So at this time I'm ready to impose sentence.  If

15  you could please stand.

16          THE DEFENDANT:  (Complies.)

17          THE COURT:  Mr. Williams, having pled guilty to

18  Count One of the indictment and the Court being satisfied

19  that you are guilty as charged, I hereby, pursuant to the

20  Sentencing Reform Act of 1984 and 18 U.S.C., Section 3551

21  and 3553, it's the judgment of the Court that Mr. Williams

22  is hereby committed to the custody of the Bureau of Prisons

23  to be imprisoned for a term of 12 months.

24          I will recommend that you get placed in a facility

25  as close as possible to Los Angeles.

1      Is that correct, Mr. Marzullo?

2      MR. MARZULLO:  Yes, it is, Your Honor.  Thank you.

3      THE COURT:  Are there any other recommendations?

4  I did see a request that he be evaluated for eligibility in

5  RDAP, but I think given the sentence he won't be eligible.

6  Don't you have to be in there 24 month?

7      MR. MARZULLO:  I believe so, Your Honor.  Maybe

8  even longer.  But may I ask that the Court sentence to

9  12 months and one day so that he receives some consideration

10  regarding reductions in sentence?

11      THE COURT:  Okay.  One day, an extra day, I'll do

12  that.  Twelve months and one day.

13      Are there any other recommendations for BOP

14  facilities or in terms of like vocational, educational

15  training, that sort of thing?

16      MR. MARZULLO:  Yes, Your Honor.  Thank you.  Your

17  Honor, we would request that he receive training in sports

18  education.  Regarding work, if he can work as -- if it's

19  available as a coach in some sort of sporting activity.

20      THE COURT:  I don't know if that's gonna be

21  available at BOP.

22      MR. MARZULLO:  I'm sorry, Your Honor?

23      THE COURT:  I would be surprised if that's

24  available at BOP, but I don't know.

25      MR. MARZULLO:  I don't know either, Your Honor.

1    Also, Your Honor, that he can work as a tutor in English and

2    in math, which he's proficient in.

3            THE COURT:  Again, I'm not sure.  You mean within

4    the prison system?

5            MR. MARZULLO:  Yes, Your Honor.

6            THE COURT:  Okay.

7            MR. MARZULLO:  And as far as education, Your

8    Honor, I don't know based upon the length of the sentence if

9    it would be available, but he would request education in

10   business administration and, if available, to receive a

11   teaching certificate and/or degree in education.

12           THE COURT:  Okay.  I will make those

13   recommendations, but first and foremost, for the record, I

14   recommend the facility closest to the Los Angeles area so he

15   can be close to his family.

16           MR. MARZULLO:  Thank you, Your Honor.  May we be

17   seated, Your Honor?

18           THE COURT:  Yes.

19           Mr. Williams, you're also going to --

20           MR. MARZULLO:  One moment, Your Honor, please.

21           Thank you, Your Honor.

22           THE COURT:  Mr. Williams, upon release from

23   imprisonment, you shall serve a term of three years of

24   supervised release.

25           While you're on supervised release, you must

1   comply with the mandatory and standard conditions adopted by

2   the Court in the Middle District of Florida.

3           In addition, you shall comply with the following

4   special conditions:

5           You shall submit to a search of your person,

6   residence, place of business, any storage units under your

7   control, computer, vehicle, conducted by the United States

8   probation officer at a reasonable time and in a reasonable

9   manner based upon reasonable suspicion of contraband or

10  evidence of a violation of a condition of release.  You need

11  to inform any residents that the premises may be subject to

12  search pursuant to this condition.  And failure to submit to

13  search could be grounds for revocation.

14          You also are prohibited from incurring any new

15  credit card charges, opening additional lines of credit, or

16  obligating yourself for any major purchases without the

17  approval of your probation officer.

18          You shall provide the probation officer with

19  access to any requested financial information.

20          You have been convicted of qualifying felony, so

21  you need to cooperate in the collection of DNA as directed

22  by the probation officer.

23          You also must refrain from any unlawful use of

24  controlled substance and submit to random drug tests as

25  directed by your probation officer.

1          This is part of the basis for the sentence,

2   because you have paid your restitution in the past, I took

3   that into account, but I also recognize that you will have a

4   substantial restitution amount to pay and I would -- I'm

5   taking that into account, into why I fashioned your

6   sentence.  You shall pay restitution in the amount of

7   $347,148 to the Internal Revenue Service.  This restitution

8   obligation shall be payable to the Clerk, U.S. District

9   Court, for distribution to the victim.  You shall pay a

10  hundred dollars immediately and pay the balance in monthly

11  payments of a hundred dollars.

12          While in the BOP custody, you shall either pay at

13  least $25 quarterly if you have a non-Unicor job or pay at

14  least 50 percent of your monthly earnings if you have a

15  Unicor job.

16          Upon release from custody, your financial

17  circumstances can be evaluated and the Court may establish a

18  new payment schedule accordingly.

19          At any time during the course of post-release

20  supervision, the victim, the government, or the defendant

21  may notify the Court of a material change in the defendant's

22  ability to pay and the Court can address the schedule.

23          The Court finds that the defendant does not have

24  the ability to pay interest, so I'm gonna waive the interest

25  requirement for the restitution.

1          Based on your financial status, I'm also waiving

2    an imposition of a fine.

3          Are there any forfeiture matters to consider,

4    Ms. Jones?  I didn't see any.

5          MS. JONES:  No, Your Honor.

6          THE COURT:  It is further ordered that you shall

7    pay to the United States a special assessment of a hundred

8    dollars, which is due immediately.

9          The Court having pronounced sentence, does counsel

10   for the defendant or for the government have any objections

11   to the sentence or the manner in which the Court pronounced

12   sentence, other than those previously stated for the record?

13         MS. JONES:  Your Honor, I could have missed this,

14   but did you ever rule on his request to remove those two

15   paragraphs from the PSR?

16         THE COURT:  No, I did not.  That's good catch.

17   Thank you.

18         MS. JONES:  I don't have an objection to that, if

19   you find it appropriate.  Particularly given the length of

20   his sentence, if it sends him to someplace later, I think

21   that makes sense.  I do recognize that BOP does rely on the

22   information in the PSR to designate where people go.

23         THE COURT:  In the ordinary course I do not strike

24   the arrests or prior -- any part of the criminal history,

25   because I think it's required by the Federal Rules of

1    Criminal Procedure for the probation officer to include it.

2    I'm not relying on it to enhance the sentence.  Obviously,

3    the government isn't attempting to prove the facts, so I'm

4    not inclined to strike it.  For that reason I think it's

5    properly part of the presentence investigation report and I

6    don't control what BOP does.  But I understand the

7    government's position.  Thank you for bringing it to my

8    attention, I had meant to return to it.  I am gonna deny the

9    motion to strike it for the reasons I stated on the record.

10   And for clarity sake, I did not rely on it in any part of

11   fashioning this sentence.

12           MS. JONES:  And then in answer to your question,

13   pursuant to my office's policy, I'll lodge an objection just

14   to the extent of the downward variance of departure.

15           THE COURT:  Understood.

16           Mr. Marzullo?

17           MR. MARZULLO:  Nothing further, Your Honor.  Thank

18   you.

19           THE COURT:  Just, sorry, to be clear, any

20   objection to the sentence or the manner in which I

21   pronounced sentence?

22           MR. MARZULLO:  None other than what's already been

23   put on the record, Your Honor.

24           THE COURT:  The defendant is hereby remanded to

25   the custody of the United States Marshal to await

1    designation by the Bureau of Prisons.

2            Mr. Williams, you did enter a plea of guilty

3    pursuant to a plea agreement.  That plea agreement contained

4    an appellate waiver, but because it might not have

5    encompassed every type of appeal you might wish to take, I

6    want to go ahead and advise you of your right to appeal.

7            You have a right to appeal from this judgment and

8    sentence within 14 days.  Failure to appeal within that

9    two-week period will be a waiver of your right to appeal.

10           You begin an appeal by filing with the Clerk of

11   the Court a written notice of appeal that is accompanied by

12   a filing fee.  If you cannot afford that fee, your attorney

13   can ask the Court to waive if and, if it's granted, you can

14   proceed without payment.

15           You also have right to the assistance of counsel

16   in taking an appeal.  As it stands right now, Mr. Marzullo

17   has the obligation to preserve and pursue any appeal that

18   you would wish to take until another counsel is substituted

19   in by order of Court.

20           Do you have any questions with regards to your

21   right to appeal?

22           THE DEFENDANT:  No, ma'am.

23           THE COURT:  Are there any other matters that I

24   should address before we adjourn?

25           MS. JONES:  Not from the United States, Your

1    Honor.

2            MR. MARZULLO:  Your Honor, no, but Mr. Williams is

3    asking me if he could just have a moment in the courtroom

4    with his family.

5            THE COURT:  That is fine.  There are Deputy

6    Marshals in the courtroom, so when that moment has passed,

7    I'm sure they will escort him downstairs.

8            MR. MARZULLO:  Thank you, Your Honor.

9            THE COURT:  Thank you.

10           Okay.  We are adjourned.

11                   (Proceedings concluded.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1   UNITED STATES DISTRICT COURT )
                                 )
2   MIDDLE DISTRICT OF FLORIDA   )

3
                REPORTER TRANSCRIPT CERTIFICATE
4
         I, Howard W. Jones, Official Court Reporter for the
5   United States District Court, Middle District of Florida,
    certify, pursuant to Section 753, Title 28, United States
6   Code, that the foregoing is a true and correct transcription
    of the stenographic notes taken by the undersigned in the
7   above-entitled matter (Pages 1 through 57 inclusive) and
    that the transcript page format is in conformance with the
8   regulations of the Judicial Conference of the United States
    of America.

9

10                                  /s   Howard W. Jones
                                    _____
11                                  Howard W. Jones, RDR, RMR, FCRR
                                    Official Court Reporter
12                                  United States District Court
                                    Middle District of Florida
13                                  Tampa Division
                                    Date:  7/29/2022
14

15

16

17

18

19

20

21

22

23

24

25
```